**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GREAT NORTHERN INSURANCE          )
COMPANY and FEDERAL               )
INSURANCE COMPANY,                )
                                  )
      Plaintiffs,                 )
                                  )
      v.                          )          CV-05-635
                                  )
GREENWICH INSURANCE               )
COMPANY,                          )
                                  )
      Defendant.                  )

**MEMORANDUM OPINION**

**CONTI, District Judge**

*Introduction*

      The instant case arises out of the blowout of a natural gas exploration well that occurred

near Ronco and Nemacolin, Pennsylvania, on February 2, 2004.  Doc. No. 49 at ¶ 1 (Plaintiffs'

Combined Statement Of Material Facts Not In Dispute).  The matter is pending before the court

on cross-motions for summary judgment.  Doc. Nos. 31 & 35.  Great Northern Insurance

Company ("Great Northern") and Federal Insurance Company ("Federal" and together with Great

Northern, collectively "plaintiffs") believe that they are entitled to equitable contribution from

Greenwich Insurance Company ("Greenwich" or "defendant") in the amount of $802,683.41 for

payments made under insurance policies issued by plaintiffs to third parties whose property was

damaged as a result of the blowout.  For the reasons that follow, the court will grant partial

summary judgment in favor of plaintiffs and partial summary judgment in favor of defendant.

Defendant's liability for equitable contribution if any shall be limited to $100,000.00.  Whether

defendant is liable for this amount will be determined at trial.

### *Background*

In February 2004, Gene D. Yost & Sons, Inc. ("Yost"), an insured of Greenwich, was

drilling a well in Ronco, Pennsylvania for Atlas America, Inc. ("Atlas America"), and its wholly-

owned subsidiary, Atlas Resources, Inc. ("Atlas Resources").  Doc. No. 49 at ¶ 2.  Atlas America

is listed as the first named insured on an insurance policy issued by Great Northern, which is a

member of the Chubb Group of Insurance Companies ("Chubb").  *Id.* at ¶ 3.  The Great Northern

policy was an Energy Industries Commercial General Liability Policy ("Great Northern Policy")

effective from February 1, 2003, through March 1, 2004.  *Id.* at ¶ 4.  The primary policy limit

was $1,000,000.00.  *Id.*  There are forty-five named insureds on the Great Northern Policy,

including Atlas America, Atlas Resources and Resource America, Inc. ("Resource America").

*Id.* at ¶ 5.

Atlas America is the first named insured on an umbrella insurance policy ("Federal

Policy") issued by Federal, which is another member of Chubb.  *Id.* at ¶ 6.  The Federal Policy

was effective from February 1, 2003, through March 1, 2004, and it set the excess policy limits at

$25,000,000.00.  *Id.* at ¶ 7.  The Federal Policy listed forty-five named insureds, including Atlas

America, Atlas Resources and Resource America.  *Id.* at ¶ 8.

Yost is an independent contractor that routinely performs oil and gas drilling tasks for

Atlas America and Atlas Resources.  *Id.* at ¶ 9.  Proudfit Insurance Agency ("Proudfit"), an

independent agency licensed by Greenwich, directs prospective clients to Greenwich and other

insurance companies.  *Id.* at ¶ 10.  On July 16, 2003, a Certificate of Liability Insurance naming

2

Yost as an insured was issued by Proudfit, which was acting as the licensed agent of Greenwich. *Id.* at ¶ 11.

Greenwich issued Policy No. MP37-001389-03 ("Greenwich Policy"), which was effective from July 9, 2003, through July 9, 2004, naming Yost and Diamond Y Enterprise, Inc. ("Diamond") as named insureds. *Id.* at ¶ 14. The Greenwich Policy has policy limits of $1,000,000.00. *Id.* at ¶ 15. Atlas Resources is named as an additional insured under the Greenwich Policy. *Id.* at ¶ 16.

Atlas America is a corporate entity organized under the laws of Delaware. Doc. No. 50 at ¶ 5. Atlas Resources is a distinct corporate entity registered under the laws of Pennsylvania. *Id.* at ¶ 6. Atlas Resources is a wholly-owned subsidiary of Atlas America. *Id.* The Great Northern Policy contains a named insured endorsement which provides identical coverage for both Atlas America and Atlas Resources. *Id.* at ¶ 9. The Federal Policy likewise contains a named insured endorsement providing identical coverage for both entities. *Id.* at ¶ 10.

Atlas America entered into a Master Work Agreement ("Agreement") with Yost for the purpose of having Yost drill natural gas development wells in and around Fayette County, Pennsylvania. Doc. No. 50 at ¶ 12. One such well was Ronco USX #3 ("Ronco Well"), which is located in the town of Ronco, Pennsylvania. *Id.* at ¶¶ 11-12. Atlas Resources entered into a drilling contract with Yost for the purpose of having Yost drill wells owned by Atlas America, including the Ronco Well. *Id.* at ¶ 12.

On February 2, 2004, there was a natural gas development well blowout at the Ronco Well. *Id.* at ¶ 13. The blowout occurred while the well was being drilled by Yost. *Id.* After the blowout, a fire ignited. *Id.* During the course of the blowout, a large amount of crude oil, gas

and combustible material was spread over the areas surrounding the Ronco Well, leaving droplets of partially combusted oil and debris on automobiles, homes and property owned by third parties. *Id.*

Subsequent to the blowout, Great Northern and Federal made settlement payments for third-party claims associated with the release of partially combusted oil droplets and debris. *Id.* at ¶ 14. Great Northern's payments equaled the policy limit of $1,000,000.00, and Federal's payments equaled $605,366.83. *Id.* The claims adjuster from Chubb assigned to handle the claims arising out of the blowout was Megan Trend ("Trend"). *Id.* at ¶ 4. Trend sent a letter dated March 1, 2004, to Duane Yost, who had signed the Agreement on behalf of Yost, and Nita Dungee ("Dungee"), a Greenwich insurance agent. *Id.* at ¶ 16. In that letter, Trend asked that Chubb be reimbursed for the payments made on behalf of Atlas America. *Id.* She contended that this reimbursement was owed to Chubb pursuant to an indemnity provision contained in the Agreement. Doc. No. 35-9 at 2-3, Ex. 8. William A. Burton ("Burton") of DBG & Associates, Inc. ("DBG"), Greenwich's claims adjuster, sent a written response to Trend. In that letter, which was dated March 9, 2004, Burton requested that Trend provide him with a copy of the Agreement. Doc. No. 50 at ¶ 17. Upon receipt of Burton's letter, Trend proceeded to send him a copy of the Agreement. *Id.* at ¶ 18. In a letter dated April 19, 2004, Burton responded by informing Trend that the indemnity provision of the Agreement applied only to claims asserted by the contractor, a subcontractor, or the employees of the contractor or a subcontractor. (Doc. No. 35-12 at 2-3, Ex. 11. Since the claims for which Trend sought reimbursement had been asserted by third parties, Burton explained that no reimbursement was owed to Chubb. *Id.*

In a letter to Duane Yost and Dungee dated February 22, 2005, Trend stated that the
Agreement contained a mutual waiver of subrogation, and that Chubb was making a claim for
contribution from Greenwich for its share of the payments made in consequence of the blowout.
Doc. No. 35-14 at 2-3, Ex. 13.  Trend stated that Atlas America was a named insured under the
Greenwich Policy as well as the Great Northern Policy and the Federal Policy, thereby creating a
situation in which concurrent coverage existed.  *Id.*  According to Trend, this situation required
the loss to be pro-rated between the insurance carriers, with Greenwich contributing its
proportionate share for the property damage sustained as a result of the blowout.  *Id.*

Burton sent Trend a letter dated April 14, 2005, in which he refused the request for
reimbursement on the ground that Greenwich did not insure Atlas America, but rather Atlas
Resources.  Doc. No. 35-15 at 2-3, Ex. 14.  Enclosed with Burton's letter was a copy of an
Additional Insured Endorsement, which listed only Atlas Resources as an additional insured.  *Id.*
Counsel for Chubb responded with a written letter to Yost, Dungee and Burton dated April 19,
2005.  Doc. No. 35-16 at 2-4, Ex. 15.  In that letter, Chubb's counsel contended that Atlas
America and Atlas Resources were the same entity from a legal standpoint, and that the
Certificate of Insurance listed the Certificate Holder under the Greenwich Policy as "Atlas
America, Inc, Resource America, Inc. et al."  *Id.*  The letter indicated that a suit would be filed to
collect the proceeds if an affirmative response to Chubb's request for payment was not made
within ten days.  *Id.*  Payment was not made and the instant litigation was commenced by
plaintiffs on May 9, 2005.  Doc. No. 1.

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 249.

*Discussion*

Since jurisdiction in this case is predicated on diversity of citizenship under 28 U.S.C. § 1332(a)(1), the court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania.  *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941).  The parties are in apparent agreement that the substantive law of Pennsylvania is applicable in this case.  Therefore, the court will proceed to analyze the relevant legal issues in accordance with Pennsylvania law.

Great Northern and Federal seek equitable contribution from Greenwich for the payments made as a result of the blowout at the Ronco Well.  In such a situation, "'the respective obligations as between several insurers who have covered the same risk do not arise out of contract, but are based upon equitable principles designed to accomplish ultimate justice in the

bearing of a specific burden.'"  *General Accident Ins. Co. of America v. Safety Nat'l Cas. Co.*,

825 F.Supp. 705, 707 (E.D.Pa. 1993) (quoting *Guar. Nat'l Ins. Co. v. Am. Motorists Ins. Co.*,

758 F.Supp. 1394, 1397 (D.Mont. 1991), aff'd in part on other grounds, 981 F.2d 1109 (9th Cir.

1992)).  "The equitable considerations that apply in a given case 'depend upon the particular

policies of insurance, the nature of the claim made, and the relation of the insured to the

insurers.'" *General Accident Ins. Co.*, 825 F.Supp. at 707 (quoting *Signal Companies v. Harbor

Ins. Co.*, 612 P.2d 889, 895 (Cal. 1980)).  The question whether Great Northern and Federal are

entitled to equitable contribution depends upon whether the Greenwich Policy covered the same

interest and subject matter against the same risk.  *See Liberty Mut. Ins. Co. v. Home Ins. Co.*, 583

F.Supp. 849, 852 (W.D.Pa. 1984).

   In determining whether the Greenwich Policy extended the same coverage for the Ronco

Well blowout as the Great Northern Policy, it is necessary to determine the extent of the

coverage provided by the Greenwich Policy.  Although this case is not brought by an insured of

Greenwich, the equitable contribution question turns precisely on the extent of the coverage

afforded to insureds under the Greenwich Policy.  The law of Pennsylvania with respect to the

interpretation of insurance contracts was explained by the Pennsylvania Supreme Court in

*Madison Construction Co. v. The Harleysville Mutual Insurance Co.*, 735 A.2d 100 (Pa. 1999):

> "[T]he task of interpreting [an insurance] contract is generally performed by a
> court rather than by a jury. The goal of that task is, of course, to ascertain the
> intent of the parties as manifested by the language of the written instrument.
> Where a provision of a policy is ambiguous, the policy provision is to be
> construed in favor of the insured and against the insurer, the drafter of the
> agreement. Where, however, the language of the contract is clear and
> unambiguous, a court is required to give effect to that language."

*Id.* at 106 (quoting *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n*, 517 A.2d 910, 913 (Pa. 1986) and *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (1983))(citations omitted).  The language of an insurance contract is deemed to be ambiguous only "if it is *reasonably* susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. 1986)(emphasis added).  This inquiry is fact specific, and "contractural terms are ambiguous if they are subject to more than one *reasonable* interpretation when applied to a particular set of facts." *Madison Constr. Co.*, 735 A.2d at 106 (emphasis added).  A court must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Id.* (citing *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982)).  Under Pennsylvania law, "ambiguous insurance policy provisions are construed in favor of coverage without regard to whether that construction is right or wrong." *Employers Mut. Cas. Co. v. Loos*, 476 F.Supp.2d 478, 487 (W.D.Pa. 2007).  In *Prudential Property & Casualty Insurance Co. v. Sartno*, 903 A.2d 1170 (Pa. 2006), the Pennsylvania Supreme Court explained:

> The instant matter is a prime example of language in a policy that can be understood in more than [one] way.  Sartno prefers one interpretation; Prudential favors the other.  Regardless of which one is "right" or "wrong," the fact is that because each interpretation is reasonable, the exclusionary term is ambiguous, and we must construe it in favor of the insured.

*Id.* at 1177.  Even though this action against Greenwich has not been commenced by an insured, the rule requiring that ambiguous policy provisions be construed in favor of coverage is nevertheless applicable in this case.  *Imperial Cas. & Indem. Co. v. High Concrete Structures,*

*Inc.*, 858 F.2d 128, 131-32 n.4 (3d Cir. 1988).  With that in mind, the court now turns to the

specific issues raised by the parties in this case.

## I.  *Entitlement to Equitable Contribution*

Greenwich argues that Great Northern and Federal do not have "standing" to assert an

equitable contribution claim on the ground that the payments were made on behalf of Atlas

America, which is not insured by Greenwich, rather than on behalf of Atlas Resources, which is

insured by Greenwich.  Doc. No. 35 at 7-13.  In this context, Greenwich's use of the term

"standing" is not understood to be a challenge to the court's subject-matter jurisdiction under

Article III of the Constitution or the jurisdictional statutes contained in Title 28 of the United

States Code.  Instead, Greenwich's contention goes to the merits of the equitable contribution

claim, which turns on whether Great Northern and Federal made payments on behalf of an

insured of Greenwich.  Great Northern and Federal argue that there is no "practical difference"

between Atlas America and Atlas Resources for purposes of the instant controversy.  Doc. No. 32

at 17.

The parties disagree with respect to whether Atlas America was an insured of Greenwich

at the time of the blowout and with respect to whether Great Northern and Federal made

payments on behalf of Atlas Resources.  The Greenwich Policy listed Yost and Diamond as

named insureds.  Doc. No. 35-5 at 5, Ex. 4.  Atlas Resources was listed as an additional insured.

Doc. No. 35-5 at 14, Ex. 4.  Although Atlas America was not listed as an additional insured on

the Greenwich Policy, Great Northern and Federal call the court's attention to a Certificate of

Liability Insurance (the "Certificate") issued by Proudfit, which contains the following language:

"Certificate holder, its parent and subsidiaries are named as additional insured [sic] on a primary

basis with respect to all work performed by the named insured." Doc. No. 36 at 8, Ex. 1. The

named insured was Yost. *Id.* The Certificate specifically lists both Atlas America and Resource

America as additional insureds. *Id.* Nevertheless, at the top of the Certificate, there is a

disclaimer which provides:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY
> AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS
> CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE
> AFFORDED BY THE POLICIES BELOW.

*Id.* Thus, it is clear that the listing of Atlas America as an additional insured on the Certificate is

not dispositive in this case, since it is the language of the Greenwich Policy that matters.

There is no question that the Greenwich Policy lists only Atlas Resources as an additional

insured. Doc. No. 35-5 at 14, Ex. 4. "An insurance policy issued to a subsidiary does not

automatically cover the parent company." *Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 167

F.Supp.2d 1004, 1008 (N.D.Ill. 2001). In order for the parent company to be covered under a

subsidiary's policy, it must show either that it is named as an additional insured or that there is

written authorization for its inclusion under the policy. *Id.* Since Great Northern and Federal

cannot make such a showing, the court concludes that Atlas America was not insured under the

Greenwich Policy. This determination, however, does not end the inquiry. The court must

proceed to address the question whether Great Northern and Federal made payments on behalf of

Atlas Resources, which is named as an additional insured under the Greenwich Policy.

Both parties rely on the testimony of Chubb's claims adjuster, Trend, to support their

positions. In her deposition, Trend testified as follows:

10

[Counsel for Greenwich]: Is it safe to say at that point in time you were unaware of a drill contract between Atlas Resources and Yost?

[Trend]: Well, it says, "Are there any contracts besides the MSA between Atlas and Yost?"

[Counsel for Greenwich]: What does Atlas refer to?

[Trend]: Atlas America and Atlas Resources.

[Counsel for Greenwich]: You use that term interchangeably?

[Trend]: Yes.

[Counsel for Greenwich]: Is there any difference between the two?

[Trend]: Atlas America is a wholly owned subsidiary of Atlas Resources.
. . . .

[Trend]: The MSA was between Atlas America, Inc., et al, operator, and Gene D. Yost and Son, independent contractor, on this 15th day of May in the year 2003.

[Counsel for Greenwich]: Was Atlas America, Inc. an operator of the Ronco Number 3 well site?

[Trend]: Yes.

[Counsel for Greenwich]: Was Atlas Resources, Inc. an operator of that well?

[Trend]: I believe so. Atlas America is a wholly owned subsidiary of Atlas Resources.

[Counsel for Greenwich]: Do you believe that Atlas Resources, Inc. and Atlas America, Inc. are separate corporations?

11

[Trend]: I don't know.

[Counsel for Greenwich]: In your mind, they are one and the same; is that correct?

[Trend]: One is a wholly owned subsidiary of the other.

. . . .

[Counsel for Greenwich]: If there is an identity between the two entities as far as legal and contractual obligations are concerned in your mind, can you tell me why it was necessary to name Atlas Resources, Inc. as an additional named insured under the two policies of insurance that the Chubb Group issued in this case?

[Trend]: I don't know, I'm not an underwriter.

[Counsel for Greenwich]: In your adjustment and payment of claims on this case, did you consider yourself to be paying damage claims on behalf of Atlas America, Inc. or Atlas Resources, Inc. or did it matter to you?

[Trend]: It didn't matter to us.

[Counsel for Greenwich]: Do you know if there were any contractual agreements in place between Atlas Resources, Inc. and Atlas America, Inc. in connection with the Ronco Number 3 well?

[Trend]: I don't know.

. . . .

[Counsel for Greenwich]: Is it your testimony that at the time you drafted Exhibit 17–which was sometime between May 11, 2004, and July 30, 2004–your using of the term Atlas referred to both Atlas Resources, Inc. and Atlas America, Inc.?

[Trend]: Yes.

[Counsel for Greenwich]: The coverages available to your insureds under both the Great Northern policy and the Federal policies, did they apply separately and distinctively as to each named insured.

[Trend]: No.

. . . .

[Counsel for Greenwich]: As you made your coverage determinations and decided to indemnify your insured for the damages claimed as a result of this Ronco Number 3 well blowout, did you consider yourself to have been paying damages on behalf of Atlas America, Inc.?

[Trend]: We were paying damages on behalf of our insured, which under this policy is both Atlas America, Inc. and Atlas Resources, and all these other entities that are listed. Had any of those entities made a claim, they would have been covered under this policy.

[Counsel for Greenwich]: Well, I assume as a condition of your making payments under either of the policies that the Chubb Group issued–being the Great Northern CGL policy of the Federal umbrella policy–a necessary precondition is legal liability on behalf of an insured; is that correct?

[Trend]: Yes.

[Counsel for Greenwich]: Which insured under either policy was legally liable for any of the damages being claimed as a result of the Ronco Number 3 well blowout?

[Trend]: From my understanding, it was Atlas America, Inc.

[Counsel for Greenwich]: And what was the basis of the legal liability of Atlas America, Inc. for the blowout?

[Trend]: They were the ones that had contracted with Yost to drill the well.

13

[Counsel for Greenwich]: How does that render that entity liable to the third parties who are making damage claims?

[Trend]: They owned the well, Atlas America owned the well–or at least in large part.

[Counsel for Greenwich]: So that, in your opinion, rendered them legally liable for the gas well blowout?

[Trend]: Yes.

[Counsel for Greenwich]: That is the basis upon which your company made payments under the Great Northern and Federal policies?

[Trend]: Yes.

Doc. No. 35-2 at 9-10, Ex. 1 at 84-85; Doc. No. 40-3 at 3-6, Ex. LL at 17, 19, 21, 24.  Greenwich relies on the portion of Trend's testimony that Atlas America was the liable party, while Great Northern and Federal rely on the portions which indicate that Trend did not consider the distinction between the two entities to be important.

Subsequent to her deposition, Trend signed a sworn affidavit in which she stated that throughout her handling of the third-party claims related to the Ronco Well blowout, "there was no distinction made between any of the named insureds under the Great Northern or Federal policies of insurance. . . ." Doc. No. 36 at 3, ¶ 18.  She also stated that she had referred to the first named insured, Atlas America, throughout the process, and that this was "consistent with the practice of claims adjustment" in situations where multiple insureds were listed on a particular policy.  Doc. No. 36 at 3, ¶ 19.  There were apparently forty-five named insureds on the Great

14

Northern Policy, including Atlas America, Atlas Resources and Resource America.  Doc. No. 36 at 2, ¶ 9.

Greenwich urges the court to ignore Trend's affidavit on the ground that it is a "sham affidavit" that has been filed solely to contradict her deposition testimony.  Doc. No. 42 at 3-8. In *Hackman v. Valley Fair*, 932 F.2d 239 (3d Cir. 1991), the United States Court of Appeals for the Third Circuit held that "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Id.* at 241.  In this case, however, Trend's affidavit is not inconsistent with her deposition testimony as a whole.  The transcript of the deposition includes instances in which Trend indicated that Great Northern and Federal were not concerned with any distinction between Atlas America and Atlas Resources.  Moreover, even a cursory review of the record indicates that Trend was confused about the precise nature of the relationship between the two entities.  Although Trend testified that Atlas America was a wholly-owned subsidiary of Atlas Resources, the parties now agree that Atlas Resources was a wholly-owned subsidiary of Atlas America.  Doc. No. 49 at ¶ 2.  Consequently, the court cannot conclude that Trend's affidavit was filed in bad faith, or that it includes disingenuous statements which contradict her deposition testimony.  The court must read the portions of the deposition presented by both parties, not just the portions cherry picked by Greenwich.

In addition to Trend's affidavit, Great Northern and Federal presented the expert report of John T. Klagholz ("Klagholz") to support their assertion that it is consistent with insurance industry practice to reference the first named insured on settlement payments rather than list all of the insureds.  Doc. No. 33-4 at 20, Ex. D ("Absent some circumstance not present in this case,

15

it is common practice in the insurance industry to identify only the first named insured on such releases, the same then applying to each and every additional named insured and additional insured as if each had been separately identified.").  Greenwich argues that only Atlas America was legally obligated to pay the third parties whose property had been damaged, and that Great Northern and Federal made payments only on behalf of Atlas America.  Doc. No. 42 at 6.  It, however, is not clear from the record whether Atlas America was, in fact, the only liable entity. While Atlas America entered into the Master Work Agreement with Yost, it was Atlas Resources which entered into a drilling contract with Yost for the purpose of drilling the Ronco Well.  Doc. No. 50 at ¶ 12.

Great Northern and Federal have also presented to the court some documentation which tends to support their argument that their payments were made, at least in part, on behalf of Atlas Resources.  In a letter to Michael George ("George"), the vice-president of Greenwich, dated June 21, 2004, William A. Burton ("Burton") of DBG & Associates, Inc., stated that the "insured" (i.e., Yost) "was drilling a well under contract with Atlas America, Inc. and/or Atlas Resources."  Doc. No. 33-3 at 30, Ex. X.  The letter acknowledged that the drilling contract was between Yost and Atlas Resources, not between Yost and Atlas America.  Doc. No. 33-3 at 31, Ex. X.  Burton's letter went on to state as follows:

> The hook in all of this is that Atlas America is not an additional insured under the policy of insurance issued to Gene D. Yost & Son, Inc.  However, Atlas Resources is an additional insured under the policy of insurance issued to Gene D. Yost.
>
> To date, Chubb has not requested additional insured status and has continued to pursue claims on behalf of Atlas America.  This is very good for us since we believe no indemnity is owed Atlas America in this matter.  However, if and when

16

Chubb figures out that Atlas Resources is an additional insured, they can certainly
pursue recovery under the policy issued to Gene D. Yost & Son.

Since the Drilling Contract is even more favorable, we do not believe that we will
owe Atlas America any indemnity but, we will definitely owe them additional
insured status.  As such, it may eventually work out that the two carriers will share
in the loss.  However, we do not intend to educate Atlas Resources or its insurer
concerning these matters.

Doc. No. 33-3 at 31, Ex. X.  In a subsequent letter dated April 20, 2005, Burton told George that

they would "continue to play this chess game with Chubb."  Doc. No. 33-3 at 35, Ex. Y.

While it is not entirely clear from the record whether Great Northern and Federal made

payments on behalf of Atlas America, Atlas Resources, or both, Great Northern and Federal have

presented sufficient evidence to defeat Greenwich's motion for summary judgment with respect

to this issue.  The question whether Great Northern and Federal made payments on behalf of

Atlas America or on behalf of Atlas Resources is a genuine issue of material fact that will be

decided at trial.  Since at the summary judgment stage disputed evidence must be viewed in the

light most favorable to the nonmoving parties on this issue – Great Northern and Federal – the

court at this time must view the payments as having been made on behalf of Atlas Resources.  It

will, of course, be incumbent upon Great Northern and Federal to establish at trial that payments

were made on behalf of Atlas Resources, because Greenwich's policy covering Atlas Resources

does not cover Atlas America.  *See Knoll Pharm. Co.*, 167 F.Supp.2d at 1008.

## II.  *The Hostile Fire Exception to the Pollution Exclusion*

In order to establish their entitlement to equitable contribution, Great Northern and

Federal must demonstrate that the Greenwich Policy covered the same interest and subject matter

17

against the same risk as the Great Northern Policy and the Federal Policy.  *See Liberty Mut. Ins.*

*Co.*, 583 F.Supp. at 852.  For purposes of this analysis, the court assumes *arguendo* that Great

Northern and Federal made payments on behalf of Atlas Resources, since the substantive issues

related to the Greenwich Policy would otherwise be inconsequential and in determining whether

to grant a motion for summary judgment the court must view all disputed facts in favor of the

nonmoving party.

      The Greenwich Policy includes a Pollution Exclusion, which provides:

      This insurance does not apply:

    . . . .

      (f)(1) to bodily injury or property damage which would not have occurred in
      whole or part but for the actual, alleged or threatened discharge, dispersal,
      seepage, migration, release or escape of pollutants at any time;

      (2) any loss, cost or expense arising out of any
            (i) request, demand or order that any Insured or others test for, monitor,
            clean up, remove, contain, treat, detoxify or neutralize, or in any way
            respond to, or assess the effects of pollutants; or
            (ii) claim, suit, directive or order by or on behalf of a governmental
            authority for damages because of testing for, monitoring, cleaning up,
            removing, containing, treating, detoxifying or neutralizing, or in any way
            responding to, or assessing the effects of pollutants;

      pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant
      including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste; waste
      includes material to be recycled, reconditioned or reclaimed;

      subparagraph f. (1) of this exclusion does not apply to bodily injury or property
      damage caused by heat, smoke or fumes from a hostile fire; as used in this
      exclusion, a hostile fire means one which becomes uncontrollable or breaks out
      from where it was intended to be;

    . . . .

Document No. 35-5 at 8-9, Ex. 4.  The dispute with respect to this matter concerns whether the

property damage in this case was "caused by heat, smoke or fumes from a hostile fire. . . ."  *Id.* at

9, Ex. 4.  This inquiry is twofold.  First, Greenwich argues that the fire following the Ronco Well

blowout did not constitute a "hostile fire" for purposes of the Hostile Fire Exception to the

Pollution Exclusion.  Doc. No. 35 at 17-19.  Second, Greenwich contends that even if the fire at

the Ronco Well was a "hostile fire," the property damage sustained by the third parties was not

caused by "heat, smoke or fumes." Doc. No. 35 at 19.  The court will address each issue in turn.

        At the outset, it is worth noting a few preliminary points.  Although there does not appear

to be a specific Pennsylvania Supreme Court decision directly on point, most jurisdictions

broadly construe ambiguous coverage clauses and narrowly construe ambiguous exclusionary

clauses.  *See York Ins. Co. v. Williams Seafood of Albany, Inc.*, 223 F.3d 1253, 1255 (11th Cir.

2000); *Am. States Ins. Co. v. Powers*, 262 F.Supp.2d 1245, 1249-50 (D.Kan. 2003); *Jobe v. Int'l

Ins. Co.*, 933 F.Supp. 844, 863 (D.Ariz. 1995); *D.D. v. Ins. Co. of North Am.*, 905 P.2d 1365,

1368 (Alaska 1995).  This court predicts that the Pennsylvania Supreme Court would adopt this

rule.  *See Pecorara v. Erie Ins. Exchange*, 596 A.2d 237, 239 (Pa.Super.Ct. 1991)("If an

ambiguity exists as to an exclusion provision, the language is to be strictly construed against the

insurer.").  Exceptions to exclusions are generally construed broadly, since they are provisions

extending coverage.  *See TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 477

(Cal. 2006).  The court concludes that any ambiguities in the Hostile Fire Exception to the

Pollution Exclusion must be construed broadly in favor of coverage.

        Greenwich argues that the fire at the Ronco Well did not meet the definition of a "hostile

fire."  Doc. No. 35 at 17-19.  The crux of Greenwich's argument is that the fire did not "become"

uncontrollable because "it was uncontrollable from its inception." *Id.* at 17.  It is, of course,

19

undisputed that the fire was never intended to exist.  Greenwich acknowledges that it has no case

law to support its proposed interpretation.  *Id.* at 18.

In support of their argument that the fire at the Ronco Well constituted a "hostile fire" for

purposes of the Greenwich Policy, Great Northern and Federal rely on the decision of the Court

of Appeals of Texas in *Mid-Continent Casualty Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418

(Tex.App. 2000).  Doc. No. 32 at 10-11.  In *Mid-Continent*, the court considered the same issue

presented in this case.  One party argued that "a hostile fire occurs only when a 'friendly' fire

(i.e., one intentionally set in an appropriate place) 'gets out of control or breaks out from where it

ought to be.'" *Mid-Continent*, 16 S.W.3d at 422.  The other party argued that "the term 'hostile

fire' includes any 'accidental' or 'unintended' fire." *Id.*  The court found the latter interpretation

to be the "more reasonable" interpretation, "because an accidental or unintended fire would be

one which is not restrained, directed or regulated by someone." *Id.*  Although the other

interpretation was also deemed to be reasonable, the court determined that the policy definition

of the term "hostile fire" was ambiguous and construed it in favor of coverage. *Id.*

Great Northern and Federal contend that Greenwich's proposed construction would read a

redundancy into the definition.  Doc. No. 32 at 7-9.  The Greenwich Policy defines a "hostile

fire" as "one which becomes uncontrollable *or* breaks out from where it was intended to be. . . ."

Doc. No. 35-5 at 9, Ex. 4 (emphasis added).  Great Northern and Federal reason that if a fire

must first exist in a "controllable" state in order to "become uncontrollable," the phrase "breaks

out from where it was intended to be" is wholly superfluous.  Doc. No. 32 at 7-9.  This argument

is not entirely correct, since a fire could conceivably be "uncontrollable" yet remain confined to a

defined area.  As the United States District Court for the District of Minnesota explained in

*Schmid v. Fireman's Fund Insurance Co.,* 97 F.Supp.2d 967 (D.Minn. 2000):

> A fire can be both uncontrollable and burning in a location other than where it
> was intended to burn.  The placement of "or" in the language "uncontrollable or
> breaks out from where it was intended to be" means that a fire could be *either*
> uncontrollable (whether within its intended location or elsewhere) *or* broken out
> from where it was intended to burn (whether controllable or uncontrollable) and
> still fall within the hostile fire exception.

*Id.* at 972 (emphasis in original).  The interpretation proposed by Greenwich would not render

the second part of the definition completely superfluous, since the two phrases are neither

mutually exclusive nor all encompassing of one another.  Depending upon the nature of the

particular fire at issue, a fire could fall into either or both of the defined categories.

As noted earlier, Pennsylvania law requires ambiguous policy provisions to be "construed

in favor of coverage without regard to whether that construction is right or wrong."  *Employers*

*Mut. Cas. Co.*, 476 F.Supp.2d at 487.  In *Mid-Continent*, the Court of Appeals of Texas found the

phrase "one which becomes uncontrollable or breaks out from where it was intended to be" to be

ambiguous.  *Mid-Continent*, 16 S.W.3d at 422.  This court finds the analysis in *Mid-Continent* to

be persuasive.  Although Greenwich contends that the fire at the Ronco Well does not meet the

"clear and unambiguous" definition of a "hostile fire," the court is not persuaded that the

definition is, in fact, *clear and unambiguous*.  Doc. No. 35 at 18.  While the instant action has

not been commenced by an insured of Greenwich, the rule of construction requiring that

ambiguities be construed in favor of coverage applies with equal force in an equitable

contribution case such as this.  *See Imperial Cas. & Indem. Co.*, 858 F.2d at 131-32 n. 4.

Moreover, because the language being construed is an *exception* to an *exclusion*, it must be

21

broadly construed as a coverage provision rather than narrowly construed as an exclusion

provision.  *See TRB Invs, Inc.*, 145 P.3d at 477.  The interpretation proposed by Great Northern

and Federal is, at a minimum, reasonable.  Given the law of Pennsylvania governing the

construction of insurance contracts, the court's inquiry can go no further.  *Prudential Property*,

903 A.2d at 1177 ("Regardless of which one is 'right' or 'wrong,' the fact is that because each

interpretation is reasonable, the exclusionary term is ambiguous, and we must construe it in favor

of the insured.").  The phrase "becomes uncontrollable" will be construed to include both

controllable fires that subsequently become uncontrollable and fires that are uncontrollable from

their inception.  Accordingly, the fire at the Ronco Well was a "hostile fire" within the meaning

of the Hostile Fire Exception to the Pollution Exclusion contained in the Greenwich Policy.[1]

---

[1]Greenwich contends that Trend had an ulterior motive for determining that the fire at the
Ronco Well was a "hostile fire" for purposes of the Great Northern Policy.  Doc. No. 35 at 17-
18.  Trend testified that if the fire had been categorized as a nonhostile fire, Chubb would have
been exposed to a $10 million limit under a pollution liability policy rather than the $1 million
limit under the Great Northern Policy.  Doc. No. 35-2 at 6, Ex. 1 at 61.  The reasons why Great
Northern and Federal categorized the fire as a "hostile fire," however, are irrelevant to the
question whether the fire was a "hostile fire" for purposes of the Greenwich Policy.  Moreover, it
makes no difference whether there is such a thing as a "nonhostile, nonfriendly fire" recognized
by the insurance industry in general.  The court need not determine that all "nonfriendly" fires are
"hostile" fires in order to construe the words "becomes uncontrollable" to include the fire at the
Ronco Well.  Doc. No. 32 at 9-10.  Since the phrase is ambiguous, it must be construed in favor
of coverage.  *Mid-Continent*, 16 S.W.3d at 422.  What matters is how the particular policy at
issue defines or uses the term, not how similar terms are defined or used in other policies.
*Trunzo v. Allstate Ins. Co.*, 2006 WL 2773468, at *10 (W.D.Pa. September 25, 2006)("The court
is not dealing with a constitutional or statutory provision which applies equally to *all* parties.
Instead, the court is being asked to construe a *particular* insurance contract agreed to by
*particular* parties.")(emphasis in original).

### III.  The Issue of Causation

Since the court has determined that the fire at the Ronco Well was a "hostile fire" for purposes of the Greenwich Policy, Greenwich's alternative argument must be addressed. Greenwich contends that the property damage sustained by the third parties, to whom payments were made on behalf of Atlas America or Atlas Resources, was not "*caused by* heat, smoke or fumes from a hostile fire." Doc. No. 35 at 19 (emphasis added).  Great Northern and Federal argue that the damage was caused by smoke from the fire at the Ronco Well.  Doc. No. 32 at 12-14.

The precise nature of what happened does not appear to be disputed by the parties.  In their complaint, Great Northern and Federal allege:

> 17.     On February 2, 2004, a natural gas developmental well blow out occurred at the Ronco Well, while it was being drilled by Yost (the "Subject Blow Out").

> 18.     As a result of the Subject Blow Out, a fire ignited that <u>dispersed a large quantity of light crude oil, gas and combustible material</u> over an area of approximately one (1) square mile, while the well burned for a period of three (3) days, <u>leaving droplets of partially combusted oil and debris on automobiles, homes and property owned by third parties</u>.

> 19.     To date, Great Northern has paid $1,000,000.00 and Federal has paid $605,366.83 on third-party claims associated with the release of oil droplets and debris from the Ronco Well following the Subject Blow Out. In addition, it is anticipated that additional proceeds will be paid by Great Northern and Federal to other third-party claimants under the Great Northern and Federal Policies.

Doc. No. 1 at ¶¶ 17-19 (emphasis added).  In her affidavit, Trend stated:

23

> [a]ll of the claims that were paid under the Great Northern and Federal Insurance
> policies arose from damage to <u>property</u> owned by third-party claimants that were
> <u>affected by partially combusted particles of oil that were transported in the plume</u>
> <u>of smoke from the well blow-out and fire</u> to these properties."

Doc. No. 36 at 5, ¶ 28 (emphasis added).

The parties are in apparent agreement that the property damage at issue in this case was not caused by "heat" or "fumes."  Nevertheless, they disagree about whether it was caused by "smoke" from the "hostile fire."  Doc. No. 32 at 12-14; Doc. No. 35 at 19-21.  These matters were explored at Trend's deposition:

> [Counsel for Greenwich]: How were pollutants caused to be released due to the
> hostile fire?

> [Trend]: Well, when something like light crude is on fire, fire can cause portions
> of the pollutants that are contained within the oil–I mean, oil is a volatile organic
> contaminant and it contains a lot of different chemicals, and when those chemicals
> are exposed to fire or burned, when they are released into the atmosphere, some of
> them are broken down and disbursed.

> [Counsel for Greenwich]: Would uncombusted oil droplets landing on one of the
> Nemacolin houses be considered a pollutant under the terms of your policy?

> [Trend]: I believe so, yes.

> [Counsel for Greenwich]: Did any of the property damage at issue here arise from
> fumes from a hostile fire?

> [Trend]: No.

> [Counsel for Greenwich]: Did any of the property damage arise from smoke from
> a hostile fire?

[Trend]: I don't recall.  I think almost all of it–all of the property damage claims pretty much were from the partially combusted droplets of oil.  I don't think anybody made a specific soot damage claim.  There might have been a couple, but I don't recall specifically.

[Counsel for Greenwich]: Did any of the property damage claims arise out of heat from the fire?

[Trend]: Well, the heat from the fire was what helped, you know, the fire disburse the droplets of oil.  So there was heat involved in the dispersion; but no, not specifically heat, nothing, like, heated up.

[Counsel for Greenwich]: There was no flame damage?

[Trend]: Well, none of the structures that they made claims for was burned.

Doc. No. 35-2 at 11-12, Ex. 1 at 89-90.  Greenwich's expert, Donald Applestein ("Applestein"), defined "smoke" as "the particles, the result from combustion."  Doc. No. 33-3 at 4, Ex. U at 68. Nevertheless, he indicated that he had no background in oil or wells.  *Id.*  Scott Blauvelt ("Blauvelt"), a geologist retained by Great Northern and Federal who conducted tests to confirm that the partially combusted oil which damaged the property at issue originated at the Ronco Well, testified that he was unsure as to whether the microdroplets of oil were a *part of* the smoke or merely *traveling with* the smoke.  Doc. No. 44 at 4, Ex. 1 at 52.  He testified as follows:

[Counsel for Greenwich]: Were these microdroplets are they part of the smoke, or are they carried separately in the smoke plume by the wind?

[Blauvelt]: The microdroplets are the particles that are traveling within the smoke column.

[Counsel for Greenwich]: Is it part of the smoke, or is it just traveling with the smoke?

25

[Blauvelt]: I don't know.

*Id.* Given the evidence contained in the record, it is clear that reasonable minds could differ as to whether the property damage sustained by the third parties was *caused by smoke* from the fire at the Ronco Well.

In support of its position that the property damage at issue in this case was not *caused by smoke from a hostile fire*, Greenwich relies on the decision of the Court of Appeals of Texas in *E & L Chipping Co. v. The Hanover Insurance Co.*, 962 S.W.2d 272 (Tex. App. 1998). In *E & L Chipping Co.*, the court determined that pollution caused by contaminated water that had been used to *put out* a fire did not result from "heat, smoke or fumes from a hostile fire. . . ." *Id.* at 277. The facts of the present case are very different from those in *E & L Chipping Co.* The issue of causation in this case is much more complicated. While reasonable minds could differ as to whether the oil was merely *carried with* the smoke or a *part of* the smoke, it is clear that the resulting pollution was not caused by substances used to *extinguish* the fire at the Ronco Well. The chain of causation in this case is arguably direct, whereas the chain of causation in *E & L Chipping Co.* (if causation could have been established *at all* in that case) was very attenuated. Moreover, the oil droplets which caused the property damage (regardless of whether they were a part of the smoke or merely carried with the smoke) resulted from the fire itself, whereas the water pollution involved in *E & L Chipping Co.* resulted from the intervening acts of those who sought to extinguish the fire. *Id.* at 273-74. Accepting Greenwich's argument on this point would be tantamount to equating fire and water. Greenwich's reliance on *E & L Chipping Co.* is misplaced.

26

Under Pennsylvania law, the terms of an insurance contract are deemed to be ambiguous if "they are subject to more than one reasonable interpretation *when applied to a particular set of facts*." *Madison Construction Co.*, 735 A.2d at 106 (emphasis added).  The language of the Greenwich Policy is ambiguous with respect to causation under the facts of this particular case. Regardless of whether the microdroplets of oil were a *part of* the smoke or merely *traveling with* the smoke, it is clearly reasonable to construe the words "caused by heat, smoke or fumes from a hostile fire" to encompass either scenario.  In either case, the smoke can fairly be said to have *caused* the property damage, since the property damage at issue would not have occurred in the absence of the smoke, i.e., the oil droplets were either part of the smoke or carried by the smoke. Although Great Northern and Federal are not insureds of Greenwich, their entitlement to equitable contribution is dependent upon Greenwich's obligation to provide coverage to its insured.  For this reason, the rule requiring that ambiguous policy provisions be construed in favor of coverage is squarely applicable in this case.  *See Imperial Cas. & Indem. Co.*, 858 F.2d at 131-132 n.4.  Given the reasonableness of the construction proposed by Great Northern and Federal, the ambiguous policy language must be construed in favor of coverage.  Accordingly, the court concludes, after construing the policy language in favor of coverage, that the property damage at issue in this case was *caused by smoke* from the fire at the Ronco Well for purposes of the Greenwich Policy.

### IV. The Pollution Hazard Incidents Exclusion

Greenwich argues that even if the Pollution Exclusion does not exclude coverage for the property damage at issue in this case, coverage is nevertheless limited to $100,000.00 under the Pollution Hazard Incidents Exclusion.  Doc. No. 35 at 22-25.  The Greenwich Policy provides

27

that coverage for certain enumerated property damage hazards may only be provided if the

insured pays additional premium charges.  Doc. No. 35-5 at 10, Ex. 4.  The relevant portion of

the Greenwich Policy provides:

> . . . pollution hazard incident, symbol "z", means an incident of property damage
> only, arising out of the sudden and accidental discharge, dispersal, release or
> escape of natural gas, oil or other petroleum substances or derivatives (including
> any oil refuse or oil mixed with wastes), well drilling or servicing chemicals or
> saline substance into or upon any land, the atmosphere or any above or below
> ground water.  The entirety of any such accidental discharge, dispersal, release or
> escape shall be deemed to be one incident.
>
> . . . .
>
> THE MOST WE WILL PAY for liability because of property damage caused by
> one or more symbol "z" pollution hazard incidents will not be greater than the
> following limits of insurance:
>
> | $100,000 | Limit per each property damage Symbol "z" Pollution Hazard Incident |
> | $100,000 | Aggregate limit per annual policy period for all property damage Symbol "z" Pollution Hazard Incidents |

Doc. No. 35-5 at 7, 16, Ex. 4.  Great Northern and Federal make no attempt to argue that the

Pollution Hazard Incidents Exclusion is inapplicable by its terms.  Instead, they argue that

Pennsylvania law precludes the application of a policy exclusion if the exclusion renders a

coverage clause illusory.  Doc. No. 40 at 7-11.

In support of their argument that the enforcement of the Pollution Hazard Incidents

Exclusion in this case would render the Hostile Fire Exception to the Pollution Exclusion

illusory, Great Northern and Federal rely heavily on last year's decision of the United States

District Court for the Middle District of Pennsylvania in *St. Mary's Area Water Authority v. St.*

*Paul Fire & Marine Insurance Co.*, 464 F.Supp.2d 397 (M.D.Pa. 2006) ("*St. Mary's I*").  Doc.

No. 40 at 7-11.   Subsequent to the filing of the briefs in this case, the district court, however,

vacated that decision on a motion for reconsideration.  *St. Mary's Area Water Auth. v. St. Paul*

*Fire & Marine Ins. Co.*, 472 F.Supp.2d 630 (M.D.Pa. 2007) ("*St. Mary's II*").   Nevertheless, the

district court's decision in *St. Mary's II* did not disturb the prior determination in *St. Mary's I*

that, under Pennsylvania law, an exclusion which renders a particular coverage clause illusory

should not be enforced in a way that would frustrate an insured's reasonable expectations.  The

district court based this determination on the Pennsylvania Supreme Court's decision in *401*

*Fourth Street, Inc. v. Investors Insurance Group*, 879 A.2d 166, 174 n.3 (Pa. 2005), which had

implicitly recognized an illusory coverage doctrine without setting forth any "formal standard for

evaluating when coverage is illusory."  *St. Mary's I*, 464 F.Supp.2d at 412.

    The district court looked to the law of Indiana for guidance and ultimately concluded that

Pennsylvania law incorporates three basic principles: First, "[a]n insurance provision is illusory if

'a premium was paid for coverage which would not pay benefits under any reasonably expected

set of circumstances.'"  *Id*. (quoting *Fid. & Guar. Ins. Underwriters, Inc. v. Everett I. Brown Co.*,

25 F.3d 484, 490 (7th Cir. 1994)).  Second, "[i]f a provision covers some risk (i.e., at least one

risk) reasonably anticipated by the parties, it is not illusory."  *Id*. (citing *City of Lawrence v.*

*Western World Ins. Co.*, 626 N.E.2d 477, 480 (Ind.App. 1993)).  Third, "[i]f an exclusion

provision would effectively preclude coverage for all risks reasonably anticipated by the parties

under a particular coverage provision (i.e., an illusory coverage provision), the coverage

provision should be enforced in such a way as to protect the reasonable expectations of the insured." *Id*. The parties in this case apparently agree that these standards are applicable under Pennsylvania law. Doc. No. 40 at 7-11; Doc. No. 46 at 5-6.

In the absence of specific guidance from the Pennsylvania Supreme Court, this court must attempt to ascertain how the Pennsylvania Supreme Court would decide this issue if it were presented with the same question. *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103, 104-10 (1939). This court agrees with the determination of the United States District Court for the Middle District of Pennsylvania that the Pennsylvania Supreme Court would most likely fashion its "illusory coverage" doctrine in accordance with the standards applicable under Indiana law. *St. Mary's I*, 464 F.Supp.2d at 411-12. In various contexts, Pennsylvania courts have recognized that decisions from courts in other states can be helpful in determining the applicable law in Pennsylvania. *See Sabad v. Fessenden*, 825 A.2d 682, 695 (Pa.Super.Ct. 2003). Indeed, the Pennsylvania Supreme Court *requires* attorneys to discuss relevant precedents from other jurisdictions when briefing the construction of analogous provisions of the Pennsylvania Constitution. *Commonwealth v. Edmonds*, 586 A.2d 887, 895 (Pa. 1991). Consequently, the court agrees with the United States District Court for the Middle District of Pennsylvania (as well as the parties in the instant case) that the standards applicable in Indiana provide the proper framework for analyzing the "illusory coverage" issue under Pennsylvania law. With that in mind, the court now turns to the specific circumstances of the present case.

Greenwich argues that the pollution resulting from the Ronco Well fire falls squarely within the terms of the Pollution Hazard Incidents Exclusion, and the court does not understand Great Northern and Federal to argue otherwise. Despite the parties' disagreements with respect

30

to whether the fire was a "hostile fire" and with respect to whether the property damage was "caused by" smoke, it is clear that the incident at the Ronco Well qualifies as

> an incident of property damage only, arising out of the sudden and accidental discharge, dispersal, release or escape of natural gas, oil or other petroleum substances or derivatives (including any oil refuse or oil mixed with wastes), well drilling or servicing chemicals or saline substance into or upon any land, the atmosphere or any above or below ground water."

Doc. No. 35-5 at 7, Ex. 4.  Consequently, the dispute is limited to the question whether the Pollution Hazard Incidents Exclusion renders the coverage available under the Hostile Fire Exception to the Pollution Exclusion illusory.

At the outset, it is worth noting that the premise of the argument made by Great Northern and Federal is itself questionable.  They attempt to glean from an exception to a particular exclusion coverage that would trump a separate and distinct exclusion.  This type of argument is at odds with "the basic principle of insurance law that coverage cannot be provided by an exclusion clause."  *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1283 (Me. 1993).  While "[a]n exclusion clause can 'subtract from coverage' granted somewhere else in the policy[,]" it cannot alone establish coverage in the first place.  *Id.* (quoting *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 387 (Me. 1989)).  In any event, however, the court need not resolve the tension between this "basic principle of insurance law" and the "reasonable expectations" principle discussed earlier, since it is clear from the language of the Greenwich Policy that the coverage provided by the Hostile Fire Exception to the Pollution Exclusion is not illusory.

Great Northern and Federal contend that the Pollution Hazard Incidents Exclusion, if enforced by the court, would render any coverage provided under the Hostile Fire Exception to

31

the Pollution Exclusion illusory.  Doc. No. 40 at 10 ("Under this circumstance, there would <u>never</u>

be coverage afforded for a hostile fire under the pollution exclusion clause, if the cited provisions

of the pollution hazard incident exclusion were given application.  Such an interpretation thwarts

any reasonably expected set of circumstances for the provision of coverage and renders the

hostile fire exception contained in defendant Greenwich's policy illusory.")(emphasis in

original).  As Greenwich points out, however, the argument advanced by Great Northern and

Federal is plainly wrong.  Doc. No. 46 at 5-6.  While the Hostile Fire Exception to the Pollution

Exclusion extends coverage "*to bodily injury or property damage* caused by heat, smoke or

fumes from a hostile fire," the Pollution Hazard Incidents Exclusion applies to "an incident of

*property damage only*, arising out of the sudden and accidental discharge, dispersal, release or

escape of natural gas, oil or other petroleum substances or derivatives (including any oil refuse or

oil mixed with wastes), well drilling or servicing chemicals or saline substance into or upon any

land, the atmosphere or any above or below ground water."  Doc. No. 35-5 at 7, Ex. 4 (emphasis

added).  The very authority relied upon by Great Northern and Federal supports the proposition

that "[i]f there is coverage for *at least one risk*, it is not illusory."  *St. Mary's I*, 464 F.Supp.2d at

412 (emphasis added).  The clear and unambiguous language of the Greenwich Policy establishes

that the Pollution Hazard Incidents Exclusion does not apply to *bodily injury*, whereas the

Hostile Fire Exception to the Pollution Exclusion extends coverage for both bodily injury and

property damage.  Doc. No. 35-5 at 7-9, Ex. 4.  Since Greenwich has identified *at least one risk*

reasonably anticipated by the parties (i.e., bodily injury) that would be covered under the Hostile

Fire Exception to the Pollution Exclusion, the Pollution Hazard Incidents Exclusion does not

render the Hostile Fire Exception illusory.  It must be remembered that "the insured's reasonable

expectations are a separate issue from illusory coverage." *St. Mary's II*, 472 F.Supp.2d at 634. The illusory coverage issue deals only "with whether exclusions take away *everything* that an insuring provision gives." *Id.* (emphasis added).  Under Pennsylvania law, an insured cannot establish that its reasonable expectations were frustrated by the language of a "clear and unambiguous" exclusion.  *Id.*

Great Northern and Federal contend t``hat a determination that the Hazard Pollution Incidents Exclusion is applicable contradicts the testimony of Applestein, George and Burton. Doc. No. 40 at 11.  First of all, their testimony is irrelevant as to this issue, since it is axiomatic that "the doctrine of waiver or estoppel cannot create an insurance contract where none existed." *Pfeiffer v. Grocers Mut. Ins. Co.*, 379 A.2d 118, 121 (Pa.Super.Ct. 1977).  Nevertheless, even if the testimony of Greenwich's witnesses could shed some light on how the Greenwich Policy should be construed, the testimony cited by Great Northern and Federal simply does not help their argument.  Applestein apparently did not have the Greenwich Policy in front of him when he was testifying, and he did not appear to know what the policy limits were.  Doc. No. 33-3 at 11, Ex. U at 94.  His testimony was so nonspecific as to this issue that he was asked whether he had, in fact, reviewed the Greenwich Policy.  *Id.* ("Sir, have you reviewed this policy?").  Burton was focused on the Hostile Fire Exception to the Pollution Exclusion when he testified that the full $1 million limit would be available if the Ronco Well fire was deemed to be a hostile fire, and there is no indication in the record that he had the Pollution Hazard Incidents Exclusion in mind at the time.  Doc. No. 33 at 33, Ex. H at 36.

George's testimony did seem to focus on the distinction between the two exclusions, but it is not clear that he viewed the property damage at issue in this case to be insured for the full $1 million.  Doc. No. 33-2 at 19, Ex. O at 59.  He testified as follows:

> [Counsel for Great Northern and Federal]: I'm referring to the full policy limits of $1 million.

> [George]: I would imagine we could probably have coverage for property damage that was not as a result of a hostile fire, yes.  The equipment and stuff around the outside of the well.

> [Counsel for Great Northern and Federal]: Would that be capped at the hundred thousand dollars limit contained in the pollution exclusion clause?[2]

> [George]: If the damage were as a result of pollution, yes.  If it was a result–if it was fire damage, no.

> [Counsel for Great Northern and Federal]: And so it's your testimony that the fire damage would be covered up to the $1 million limit?

> [George]: If the damage was as a result of a hostile fire, yes, it would be covered up to the limit.  But if the damage is as a result of pollution, it would be subject to the hundred thousand dollar limitation of the policy.

Doc. No. 33-2 at 19, Ex. O at 59.  Although Great Northern and Federal provide the court with only brief excerpts of George's testimony, making it difficult for the court to read his words in context, it appears that he was making a distinction between property damage caused by a fire itself (i.e., property damaged by heat), which could not be properly characterized as pollution-related damage, and property damage caused by *pollution from a fire*.  There is no dispute that

---

[2]The words "pollution exclusion clause" apparently refer to what the court identified as the "Pollution Hazard Incidents Exclusion."

34

the property damage at issue in the present case falls into the latter category, since the complaint itself mentions only "third-party claims associated with the release of oil droplets and debris from the Ronco Well following the Subject Blow Out." Doc. No. 1 at ¶ 19. If anything, George's testimony may identify *another* risk for which coverage would exist under the Hostile Fire Exception to the Pollution Exclusion (i.e., property damage caused by *heat* rather than *pollution*), thereby providing further support for Greenwich's argument that the coverage provided under the Hostile Fire Exception is not illusory. The question raised by George's purported distinction, of course, is whether such "heat damage" would be attributable to "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste." Doc. No. 35-5 at 9, Ex. 4. The court need not reach this question, however, because even if the court misunderstands George's testimony, Great Northern and Federal cannot escape the clear and unambiguous language of the Pollution Hazard Incidents Exclusion. The *language* of the Pollution Hazard Incidents Exclusion is not dependent on the testimony of Greenwich's witnesses, and the court understands that Great Northern and Federal are not contesting that the damage caused by the Ronco Well fire falls within the *language* of that exclusion. Accordingly, Greenwich's liability for contribution, if any, is limited to $100,000.00.

## V. The Volunteer Issue

Greenwich argues that Federal is not entitled to equitable contribution even if Greenwich is liable to Great Northern, since any payments made by Federal (under the "umbrella" Federal Policy) occurred prior to Atlas Resources' exhaustion of its primary coverage (i.e., coverage under both the Great Northern Policy and the Greenwich Policy). Doc. No. 35 at 13-15. According to Greenwich, if liability exists under the Greenwich Policy, Federal made payments

35

as a "volunteer" under Pennsylvania law, since the total amount paid by Great Northern and Federal did not exceed $2 million (i.e., the policy limits of both the Great Northern Policy and the Greenwich Policy).[3]  Given the court's determination that Greenwich's liability, if any, is limited to $100,000.00, the total amount paid by Great Northern and Federal (i.e., $1,605,366.83) exceeds $1,100,000.00 (i.e., the total of the applicable policy limits under the Great Northern Policy and the Greenwich Policy).  Therefore, Federal's obligation to insure property damage in the amount it paid, i.e, $605,366.83, is no longer in question.  Whether the $100,000.00 potentially owed by Greenwich should be apportioned between Great Northern and Federal is for Great Northern and Federal to decide, since it has no bearing on Greenwich's overall liability for equitable contribution.

In summary, the fire resulting from the blowout at the Ronco Well was a "hostile fire" within the meaning of the Greenwich Policy.  Nevertheless, the clear and unambiguous language of the Pollution Hazard Incidents Exclusion limits Greenwich's potential liability for equitable contribution to $100,000.00.  Greenwich's liability will depend on whether Great Northern made payments on behalf of Atlas Resources.

---

[3]In the complaint, Great Northern seeks $500,000.00 and Federal seeks $302,683.41. Doc. No. 1 at ¶¶ 20-33.  It is unclear to the court why Great Northern is not seeking reimbursement for the full $1,000,000.00.  Since the Federal Policy is merely an umbrella policy, Federal would not have been required to make payments unless the total payments made by Great Northern and Greenwich exceeded $ 2 million (i.e., the total of the policy limits under the primary coverage policies).

*Conclusion*

For the reasons set forth above the plaintiffs' motion for summary judgment (Doc. No. 31) is **GRANTED IN PART** and **DENIED IN PART** and defendant's motion for summary judgment (Doc. No. 35) is **GRANTEDIN PART** and **DENIED IN PART**.  The only issue left for trial is whether Great Northern made payments on behalf of Atlas Resources.

By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: August 24, 2007

cc: counsel of record

37